IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:08CR3172 |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM** |
| v. | ) | **AND ORDER** |
| | ) | |
| KEVIN S. BOSLAU, | ) | |
| | ) | |
| Defendant. | ) | |

  This matter is before the court on a report and recommendation by Magistrate Judge Piester (filing 27), recommending that the defendant's motion to suppress (filing 20) be denied in all respects. The defendant has filed a statement of objections (filing 30) pursuant to NECrimR 57.3 and 28 U.S.C. § 636(b)(1), and the government has responded to those objections. Upon de novo review, I find that the report and recommendation should be adopted, as modified by this memorandum.

  The defendant, Kevin S. Boslau, is charged with violating 18 U.S.C. §§ 922(d) (transfer of a firearm to a felon) and 922(a)(6) (making false statements in connection with the acquisition of a firearm). Boslau allegedly sold four pistols and one rifle to a known felon, Danny Soumpholphakdy, and allegedly acquired a pistol from a gun dealer by falsely representing that he was the actual purchaser of the pistol and was not an unlawful user of a controlled substance.

  The motion to suppress concerns incriminating statements that Boslau made during a video-recorded interview conducted on November 25, 2008, at the Grand Island Law Enforcement Center by Investigators Mark Dreher and Ben Aarants of the Grand Island Police Department. It is undisputed that no *Miranda* warnings were administered to Boslau either before or during the interview. After hearing testimony from both officers and from the defendant, and after viewing the video recording of

the interview (Exhibit 1), Judge Piester concluded that Boslau was not in custody at any time during the interview and that he made the statements voluntarily. I have reached the same conclusions after reading the transcript of the evidentiary hearing that Judge Piester conducted on February 29, 2009 (filing 29), and after watching Exhibit 1.

### *Factual Background*

Each officer had a different reason for interviewing Boslau on November 25, 2008. Aarants wanted to talk to Boslau about a .40 caliber Taurus pistol that Boslau had reported as stolen to the Grand Island Police Department in May 2008. The gun had recently been recovered by the Lincoln Police Department. Dreher wanted to talk to Boslau about another gun, a 9mm Glock pistol, that was found in the possession of a convicted drug dealer, Danny Soumpholphakdy, along with a receipt showing that Boslau had previously purchased the gun. The interview was arranged when Boslau telephoned in response to Aarant's leaving his business card at Boslau's residence. Aarants testified that during this call he requested Boslau to come to the Grand Island Law Enforcement Center to discuss the gun theft report. Boslau, who did not know to whom he had spoken on the phone, testified that he was not told why the Grand Island police wanted to talk to him, but that someone from the Lincoln Police Department had already notified him about their recovery of the .40 caliber pistol.

Boslau immediately drove to the Grand Island Law Enforcement Center, accompanied by his girlfriend, Karen Arens. Both were escorted to an interview room that was located in the interior of the building. The small, windowless room contained only a round table surrounded by four chairs. Boslau and Arens were seated on the side of the room away from the door, while Aarants and Dreher sat on the other side. The door to the room was closed throughout the interview.

Aarants began the interview by asking Boslau for some identification. Boslau handed Aarants his drivers's license. The officer wrote down information from the license, but failed to return it to Boslau right away. Aarants testified that he kept the license out of carelessness.

Aarants questioned Boslau about the reported theft and asked him to explain why he was known by the person who was found in possession of the gun, Tommy Bullacek (phonetic spelling). Boslau denied knowing Bullacek. He was then questioned about other gun thefts and was asked to list the type and current location of all guns he owned.

Dreher took over the questioning about 14 minutes into the interview. He introduced himself and stated that he worked for the federal Drug Task Force, with the FBI. Dreher showed Boslau the ATF form that he had signed when purchasing a 9mm Glock pistol from GI Loan, and pointed out Boslau's written representations that he was the actual purchaser of the gun and was not an illegal drug user. Dreher then advised Boslau that the gun was recently found in the possession of Danny Soumpholphakdy, who is a convicted felon. Boslau stated that he knew Danny, but did not know about his criminal record. Dreher then asked if Boslau was aware that Danny sold drugs. Boslau replied "At one time, yeah."

Dreher next informed Boslau that he had interviewed someone by the name of Robert Hainsworth (phonetic spelling). Boslau and Arens both stated that they knew the person. Dreher indicated that Hainsworth had gotten into deep trouble for drugs and guns and was looking at a lot of prison time, but that he had recently gotten the opportunity to talk to Dreher and there was a chance that he would get his sentence reduced by cooperating. Dreher stated that everyone gets this chance, and that he would soon be talking to Danny about the 9mm Glock pistol. Dreher said that Hainsworth claimed that Boslau and Arens had introduced him to a drug dealer in 2006 or 2007, and that since then he had given them ½ gram of methamphetamine for

every ¼ to ½ ounce that he purchased from that dealer. When Boslau and Arens denied this, Dreher told them that he was "going to show you what a conspiracy is." He stated that Hainsworth could put about a pound of dope on them in one year, and that he only needed 50 grams to bring an indictment. Dreher then stated that he had also talked to someone named Bob Cranston (phonetic spelling). Boslau and Arens said they didn't know him. Dreher stated that Cranston had hooked up with Danny, and knew that Danny was delivering drugs to Boslau and Arens, and also that Boslau had purchased a .40 caliber pistol and a 9mm pistol from GI Loan and traded them to Danny, who later traded the .40 caliber pistol for a drug debt. Finally, Dreher said that Tommy Bullacek stated that he had gotten the .40 caliber pistol from Danny. Dreher then asked Boslau if he could guess what Danny was going to say about the guns. Boslau denied trading or selling any guns and stated that he didn't even know if the 9mm pistol was gone.

At this point, which was about 20 minutes into the interview, Dreher said, "Okay, and that's what you can stay at, and what I do is— I'm going to bring a federal indictment against you, Mr. Boslau, with the U.S. government over a firearms charge and probably a conspiracy to distribute methamphetamine. You can sit here and lie to me or you can help me figure out some of these gun charges." A short time later Aarants said, "This is the point where we're no longer talking to you as a victim of things. Okay? You need to know, you don't have to tell us anything. That's your right. You can walk out the door right now. You're free to leave, and I want you to know that." Aarants turned to Dreher and asked if they were planning on making any arrests. When Dreher replied in the negative, Aarants told Boslau, "We're not going to arrest you." Dreher simultaneously said the same thing, and added, "No, because you know what, I'm going to give the sweeter deal to the first person who gets on board. If you want to be in denial, walk out the door, but we will see you again."

Aarants continued by stating, "This is your opportunity to let us know what's going on. This is your opportunity to work with us, so that we can work with you.

We're not looking at you as the big guy, but we're looking at you as part of the picture, so it's time to maybe sink or swim." He and Dreher then discussed the number of years that Hainsworth, Cranston, and Danny Soumpholphakdy could each spend in prison. He then asked Boslau, "Do you see where we're heading here? You need to think about what side of the fence you're going to be playing on. Do you understand that?"

Boslau responded by denying that he ever sold drugs but admitting that he was a drug user. After further questioning he also admitted that he let Danny use the 9mm and .40 caliber pistols, and stated that Danny had told him to report the .40 caliber pistol as stolen. About 32 minutes into the interview, Boslau asked if he was going to be arrested whether he would have a chance to pick up the animal traps that he had set out. Aarants repeated that he was not going to be arrested. Noticing that Aarants still had Boslau's driver's license, Dreher told him to return it, which he did. Dreher said to Boslau, "Well, we told you, you aren't under arrest, you can leave anytime, and when we're done you're gonna leave anytime."

After further discussion, Boslau volunteered that he had also given Danny a rifle and 2 other pistols. He then admitted under questioning that Danny had given him the money to buy all of the guns. He also stated that he bought drugs from Danny and Hainsworth. The interview concluded after about 43 minutes.

### *The Magistrate Judge's Report and Recommendation*

Judge Piester announced his findings and conclusions at the end of the evidentiary hearing, stating:

> The law under Miranda versus Arizona is that any time a suspect is in custody he must be advised of his rights to remain silent and his right to counsel prior to any questioning taking place.

It's clear that there were no Miranda rights delivered to the defendant and so the issue before the court is whether he was in custody.

The Eighth Circuit has a number of tests. Essentially I must consider the totality of the circumstances in determining whether a reasonable person in the defendant's position, that is in these circumstances, would have thought or believed that he was free to go.

And I have to consider whether he was informed at the time of the questioning that it was voluntary and he was free to leave and that he was not considered under arrest.

He was not so advised at the commencement of the interview.

He was advised of that after the interview became more accusatory in the midst of it.

Whether the defendant possessed unrestrained freedom of movement during questioning, he did not.

Whether the suspect initiated contact with authorities or voluntary acquiesced to official request to respond to questions.

He voluntary acquiesced in this case. He was telephoned by the police.

He returned the call. He was asked to come to the station and he did.

The fact that he believed that he had to is a subjective belief on his part, honorable citizenship type of belief, but in fact he didn't have to, and I think a reasonable person in his position would believe that he didn't have to acquiesce to the invitation or the request of the police to go to the station on that day and time.

He could have arranged it for another time. He could have refused to go altogether.

Whether the atmosphere of the questioning was police-dominated it was and it wasn't.

In this circumstance you have two officers and you have two citizens.

The fact that the girlfriend was present is a source of some balancing to the presence of the police, not so much in that she was his advocate, although at times she was, but just the presence of someone to be supportive I think is important in this type of circumstance.

And whether the suspect was placed under arrest at the termination of the questioning.

He was not arrested. He was told actually several times toward the end of the interview that he was not going to be arrested at the end and was not.

I think combining all of these circumstances a reasonable person would not have believed that he was under arrest under the circumstances and I therefore find that he was not in custody so the Miranda rights not being given at the commencement of the interview is of no consequence.

We turn then to the mater [sic] of the statements made by the defendant during the interview and whether they were voluntary or involuntary.

The test here again is from a totality of the circumstances whether the police, or the officers in this case, engaged in activity which objectively speaking would overbear the will of the defendant to remain silent.

In the circumstances here, I have reviewed the videotape and it's clear throughout the videotape that the defendant is appearing to be eager to answer the questions of the officers. Sometimes maybe too eager.

Sometimes eager to say something that wasn't totally true, which he later changed after he was confronted with the inconsistency.

The real issue here is whether the interview techniques by the investigators overstep the bounds of propriety in getting the defendant to talk, that is overbearing a reasonable will on his part not to talk.

I think that it's a close question. I think that the use of the terminology by the investigators threatening an indictment, advising that there might be a sweeter deal for him if he talked now, telling him that this is your chance to level with us, implying but not saying specifically that there will be no other chance in the future, those are pretty strong words.

Under the circumstances here I think they probably did not make the defendant talk when he wouldn't have talked otherwise.

The tone of voice was not argumentative. There were no threats of force.

The defendant, while not a highly educated man, had at least some prior experience in the criminal justice system, I believe, and is of

> normal intelligence, and I think that the confrontation certainly might have been more severe than they were.
>
> I don't think that the investigators engaged in activity that hasn't been done before, or that won't be done again, but I think it gets close to the line and I hope that I don't see it again.
>
> In any event, close doesn't put it over the line. I think the totality of the circumstances is that the statements made by the defendant in the interview were voluntarily made and therefore their admission into evidence at trial would not violate the 5th Amendment.
>
> So I'm going to recommend that the motion to suppress be denied in all respects.

(Filing 29, at 64:1-68:2.)

### *Miranda Warnings*

"When a suspect is interrogated in a custodial setting, the police must advise him of his right not to answer questions and to have an attorney present during questioning." *United States v. Ollie*, 442 F.3d 1135, 1137-40 (8th Cir. 2006) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "An individual is in custody when placed under formal arrest, or when his or her freedom is restricted to a degree akin to formal arrest." *United States v. Elzahabi*, 557 F.3d 879, 883-84 (8th Cir. 2009) (citing *Ollie*, 442 F.3d at 1137). "Whether [Boslau] was in custody turns on whether, under the totality of the circumstances he faced at the time of his questioning, a reasonable person in his position would have felt free to end the interrogation and leave. *Id.* (citing *United States v. Brave Heart*, 397 F.3d 1035, 1038-39 (8th Cir. 2005)). "This determination is based on the objective circumstances, not on subjective views of the participants." *United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir. 2005) (citing *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc)).

> In *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir.1990), [the Eighth Circuit] identified six factors to consider in determining whether an individual is in custody for the purposes of *Miranda*: (1)

> whether the suspect was informed that he or she was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong-arm tactics or strategies were employed; (5) whether the atmosphere was police-dominated; or, (6) whether the suspect was placed under arrest at the end of questioning. *Id.* These factors are not exclusive; custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *United States v. Czichray*, 378 F.3d 822, 827-28 (8th Cir. 2004). The "most obvious and effective means of demonstrating that a suspect has not been taken into custody" is an express advisement that the suspect is not under arrest and that his participation in questioning is voluntary. *Brave Heart*, 397 F.3d at 1039, quoting *Griffin*, 922 F.2d at 1349.

*Elzahabi*, 557 F.3d at 883.

> As the *Griffin* court carefully explained, no factor qualifies as dispositive in any given case. The first three indicia are "mitigating factors," the presence of one or more of which "would tend to mitigate the existence of custody at the time of the questioning." 922 F.2d at 1349. The final three indicia comprise "coercive factors," the presence of one or more of which would tend to compel a finding of custody. *Id.* A court may make a finding of custody even without the affirmative presence of each indicia of custody. *Id.* (citing *United States v. Longbehn*, 850 F.2d 450, 452-53 (8th Cir.1988)). "[A] particularly strong showing with respect to one factor," by contrast, "may compensate for a deficiency with respect to other factors." *Id.* (citing *South Dakota v. Long*, 465 F.2d 65, 70 (8th Cir.1972)).

*United States v. Mottl*, 946 F.2d 1366, 1369 n. 4 (8th Cir. 1991).

Boslau was expressly advised, after approximately 20 minutes of questioning, and after being apprised of some of the evidence that had been gathered against him, that he would not be arrested, that he was free to leave anytime, and that he was not required to tell the police anything. "An 'explicit assertion that the defendant may

end the encounter . . . generally removes any custodial trappings from the questioning.'" *Elzahabi*, 557 F.3d at 884 (quoting *Ollie*, 442 F.3d at 1138). During the first 20 minutes of the interview, however, no admonitions were given.

Judge Piester correctly found that Boslau did not possess unrestrained freedom of movement during the questioning. There was hardly enough room to stand, let alone to move about, in the small witness room, and to leave the room Boslau would have been required to squeeze past one of the officers and open the door. Boslau's freedom of movement was also restricted by the fact that Investigator Aarants failed to return his driver's license until near the end of the interview. These restrictions were not very significant, however, and it must be noted that Boslau never tried to stand up or leave, and never asked for his license back. *See Ollie*, 442 F.3d at 1138 ("A suspect will generally feel more able to end an interview when his mobility is unimpeded by the authorities. . . The record is silent on this issue because Mr. Ollie never tried to move about or leave the interview room. Because the record is thin, we believe that it is impossible to determine if Mr. Ollie retained his freedom of movement throughout the questioning."). On the whole, therefore, this factor is entitled to very little weight.

Boslau acquiesced to the interview, and, in fact, was the one who originally contacted the Grand Island Police Department to file a theft report for the .40 caliber Taurus pistol, which Investigator Aarants was following up on. There is no evidence that Boslau was compelled to attend the interview, and he testified that the person he spoke to on the phone "[j]ust asked me if I could come down to the Grand Island Police Department to talk to them." (Filing 29, at 39:8-9.)

Judge Piester did not make a specific finding as to whether strong-arm tactics or strategies were employed. Boslau argues that Aarants and Dreher "threaten[ed] to bring an indictment against [him] and promis[ed] to see him again in the event he did not stay for the interview, cooperate, and give statements." (Filing 30-2, at 6.) For

-10-

purposes of determining whether Boslau was in custody, however, the only relevant inquiry is whether he was pressured not to get up and leave. "The ultimate question therefore is not whether a reasonable person would fear that he could be punished unless he spoke, but whether he could be punished for ending the interview without the permission of the police . . .. If such a fear is a reasonable one, the existence of such a fear on the part of the [defendant] would contribute to a finding of custody." *Ollie*, 442 F.3d at 1139. "The critical inquiry is not whether the interview took place in a coercive environment, but rather whether the defendant's 'freedom to depart was restricted in any way.'" *Elzahabi*, 557 F.3d 879 at 884 (quoting *LeBrun*, 363 F.3d at 720). "[T]he coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart." *Id.* (quoting *LeBrun*, 363 F.3d at 721).

Investigator Dreher's statement to Boslau that "I'm going to bring a federal indictment against you . . . over a firearms charge and probably a conspiracy to distribute methamphetamine" was made after Boslau denied selling or trading any guns, and claimed he did not know that Danny Soumpholphakdy was in possession of the 9mm Glock pistol. Even if this statement might be construed as a threat, it related directly to Boslau's refusal to confess. Dreher's further statement to Boslau that "[i]f you want to be in denial, walk out the door, but we will see you again" was simply another way of saying that Boslau's troubles would not be over if he left. Neither statement could reasonably be understood to convey a threat that Boslau would be prosecuted for stopping the interview (or, conversely, that he would be rewarded just for staying).

Judge Piester found that the atmosphere of the questioning was not police-dominated. Respectfully, I disagree. "It is true that an interview is not custodial simply because it occurs at the station house. But if the fact that questioning taking place on a suspect's 'home turf' cuts against a finding of custody, *see United States v. Rorex,* 737 F.2d 753, 756 (8th Cir.1984), then the converse must also be true:

-11-

Interviews taking place on the police officers' 'home turf' are more likely to be police-dominated." *Ollie*, 442 F.3d at 1139.  The two officers questioned Boslau in a windowless room behind a closed door, and video recorded the interview (although it is unclear whether Boslau was aware of the recording).  As noted by Judge Piester, though, the presence of Boslau's girlfriend in the room was an ameliorating factor.[1] *Cf. Griffin*, 922 F.2d at 1352 ("A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements, . . ..").

Finally, Boslau was not placed under arrest at the end of questioning.  He was also informed on two different occasions during the interview that he was not going to be arrested.

Factors tending to show that Boslau was in custody are that: (1) he was not informed at the outset of the interview that he was free to leave and that answering questions was voluntary; (2) he was limited to some extent in his ability to move about during the interview or to leave; and (3) the atmosphere was police-dominated. On the other hand, (1) after the officers accused Boslau of supplying guns to drug dealers and participating in a drug conspiracy, he was advised that he was free to leave and was not required to answer questions; (2) Boslau acquiesced to the interview; (3) no strong-arm tactics were used to prevent him from leaving; and (4) as promised during the interview, Boslau was not placed under arrest.

---

[1] While Investigator Aarents testified that Karen Arens was allowed to sit with Boslau in the interview room because "initially . . . we were not interviewing him as a suspect; we were trying to get information . . . [and] were talking to him as a witness" (filing 29, at 9:18-20), Boslau was a suspect before the interview started. Arens, of course, was also implicated in the alleged drug conspiracy.

-12-

"It is important to note that a decision on the matter of custody requires more than tallying a ledger. . . . In the end, these criteria are only useful tools meant to focus attention. The ultimate decision requires a hard look at all of the circumstances." *Ollie*, 442 F.3d at 1140. Considering the totality of the circumstances, I conclude that a reasonable person in Boslau's position would have felt free to end the interview at any point in time. The tone of the interview was amicable while Boslau was being questioned about the gun theft report, and, frankly, it would have seemed incongruous for the officers to have informed Boslau that he could leave without providing any more information concerning the alleged theft. When the tone of the interview changed to confrontational, the appropriate advisement was given. This factor, more than any other, convinces me that Boslau was not in custody, and thus was not required to be given *Miranda* warnings.

### *Voluntariness of Statements*

"A statement is involuntary if the totality of the circumstances show that 'pressures exerted by the authorities overwhelmed the defendant's will.'" *United States v. Dehghani*, 550 F.3d 716, 719-720 (8th Cir. 2008) (quoting *United States v. Martin*, 369 F.3d 1046, 1055 (8th Cir.2004)). "However, an interrogation of a suspect will always involve some pressure 'because its purpose is to elicit a confession.'" *Id.* (quoting *Martin*, 369 F.3d at 1055). "A confession is voluntary if it is 'the product of an essentially free and unconstrained choice by its maker.'" *United States v. New*, 491 F.3d 369, 374 (8th Cir. 2007) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).

"The test for determining the voluntariness of a confession is whether the police extracted the confession by threats, violence, or direct or implied promises, such that the 'defendant's will [was] overborne and his capacity for self-determination critically impaired.'" *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008) (quoting *United States v. Kilgore*, 58 F.3d 350, 353 (8th Cir.1995)).

In applying this test a court "must consider the totality of the circumstances, including law-enforcement officials' conduct and the defendant's capacity to resist pressure." *Id.*

Suspects' characteristics which may be relevant include: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs; (4) whether they confessed after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system. *See United States v. Griffith*, 533 F.3d 979, 984 (8th Cir. 2008). Relevant characteristics of the environment in which a confession was made include whether the person: (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the confession was made; and (5) was in a public or a secluded place. *See id.* As with the factors for determining if a suspect was in custody, these factors for determining the voluntariness of a confession are not applied mechanically, but serve to guide the court's analysis. *See id.*

Boslau is currently 48 years old. He appears to be of average intelligence, and has a G.E.D. There is no evidence that he was intoxicated or under the influence of drugs, and although he has a hearing impairment, he appeared to understand the questioning. Boslau was not given *Miranda* warnings, but was told in a timely manner that he was not required to answer the officer's questions and was free to leave. Judge Piester stated that he believed Boslau had some prior experience with the criminal justice system, but this statement apparently relates to Boslau's testimony regarding an incident that happened when he was 14 years old. His criminal history is not in the record, but he apparently was eligible to hold a gun permit. The interview was relatively short, lasting approximately 43 minutes. Boslau was not in custody or under arrest when he made the statements. The interview took place in a

closed room at the law enforcement center, but Boslau's girlfriend was present at all times.

Defense counsel contends that "Dreher and Aarants promised Boslau a 'sweeter deal' if he got 'on board,' cooperated, and gave statements[, and] . . . threatened Boslau if he walked out of the interview." (Filing 30-2, at 6.) The government does not refute this contention, but merely counters that "the law finds statements to have been voluntarily made even though produced in part by a wide variety of promises and/or coercion." (Filing 34, at 4-5.)

The government is correct that "a promise made by law enforcement 'does not render a confession involuntary per se.'" *LeBrun*, 363 F.3d at 725 (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001)). "A promise is merely one factor in the totality of the circumstances." *Id.* "Whatever the facts of an individual case, our polestar always must be to determine whether or not the authorities overbore the defendant's will and critically impaired his capacity for self-determination." *Id.* "This is a very demanding standard[.]" *Id.*, at 726. "Thus, it is not enough to show that the authorities' representations were the but-for cause of a confession." *Id.*, at 725 (citing *Schneckloth*, 412 U.S. at 224).

Boslau was not physically threatened or placed under emotional duress by the officers. There were no raised voices, fist-pounding, or other displays of anger. Boslau was only threatened with losing the opportunity to make a deal if he walked out the door; that is, he was told it was "sink or swim" time. It was not expressly stated or even implied that Boslau would face enhanced charges if he refused to cooperate. "A statement is compelled only when the authorities expressly or implicitly threaten to punish the suspect unless he or she speaks." *Ollie*, 442 F.3d at 1139 (citing *Minnesota v. Murphy*, 465 U.S. 420, 435-38 (1984)).

There were also no specific promises of leniency made.  For example, Boslau was not told that the drug conspiracy charge would be dropped if he confessed to the gun charges.  He was only offered the prospect of some sort of a deal if he talked. Considering the totality of the circumstances, I conclude that Investigators Aarants and Dreher did not overbear Boslau's will and critically impair his capacity for self-determination during their interview.  *See, e.g.*, *United States v. Larry*, 126 F.3d 1077, 1079 (8th Cir.1997) (defendant's statement implicating himself as felon in possession of ammunition was voluntary even though induced by promise that he would not be prosecuted for separate offense involving drive-by shooting).

For the reasons stated,

IT IS ORDERED that:

1. the magistrate judge's report and recommendation (filing 27) is adopted, as modified by the foregoing memorandum;

2. the defendant's statement of objections (filing 30) is denied; and

3. the defendant's motion to suppress (filing 20) is denied in all respects.

April 22, 2009.                         BY THE COURT:

                                        s/ *Richard G. Kopf*
                                        United States District Judge